IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME McCALLION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:13-cv-<u>  50 Erie  </u> |
| | ) | |
| BRIAN AMES, | ) | |
| | ) | |
| *Defendant.* | ) | JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiff JEROME McCALLION, by his attorneys the Mizner Law Firm, files this Complaint and states:

1. Plaintiff Jerome McCallion is an adult individual living in Erie, Pennsylvania and a former inmate in the Erie County Prison.

2. Mr. McCallion served in the United States Army from 1968 to 1971 and was deployed overseas to Vietnam. He was honorably discharged at the rank of Specialist (E-5).

3. Mr. McCallion is currently homeless.

4. Defendant Brian Ames is an adult individual with a place of business at 1618 Ash Street, Erie, Pennsylvania 16503. At all times pertinent to this Complaint, Defendant Brian Ames was a Corrections Officer at the Erie County Prison. Defendant Ames is sued in his individual capacity.

5. This action is being brought under the Civil Rights Act, 42 U.S.C. § 1983 which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States. This action arises under the Eighth Amendment to the

United States Constitution which bars cruel and unusual punishment. This Honorable Court has subject matter jurisdiction over this civil rights action pursuant to 28 U.S.C. §§ 1331 and 1343. This Honorable Court has pendent jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

7. Mr. McCallion was born on July 22, 1949, stands approximately 5'7" tall, and has a slender build and a small frame.

8. On or about May 12, 2011, Mr. McCallion was housed in the upper tier of cells on the Restrictive Housing Unit (RHU) of the Erie County Prison.

9. On that date, Defendant Ames went to Mr. McCallion's cell.

10. Mr. McCallion believed he was being taken to the yard; however, Defendant Ames intended to take Mr. McCallion to get a shower.

11. The Pod on which Mr. McCallion was housed was equipped with showers on both the upper tier and the lower tier. As a result, it was not necessary for Mr. McCallion to descend to the lower tier in order to receive a shower.

12. With Mr. McCallion's cooperation, Defendant Ames secured Mr. McCallion's hands with handcuffs in front of his body through the slot in Mr. McCallion's cell door and opened the door to let Mr. McCallion out.

13. Mr. McCallion then began to walk in the opposite direction of the shower and down the stairs from the upper tier to the lower tier.

14. When Mr. McCallion reached approximately halfway down the stairs, Corrections Officer Kruszewski asked Mr. McCallion what he was doing.

15. Mr. McCallion replied, "I'm going to yard."

16. Kruszewski advised Mr. McCallion that there was another inmate in the yard already and that Mr. McCallion was getting a shower at that time instead.

17. Mr. McCallion calmly turned around on the stairs and began to ascend back to the top tier.

18. As he walked up the stairs, Defendant Ames became agitated, and yelled at Mr. McCallion something to the effect of "I'm not going to put up with this anymore."

19. When Mr. McCallion reached the top of the stairs, Defendant Ames grabbed Mr. McCallion's handcuffs with one hand. Defendant Ames placed his other hand on the back of Mr. McCallion's head and slammed it into a wall.

20. Mr. McCallion blacked out at this point. When he came to, he found himself just inside the door of his cell with Ames further inside the cell. Ames then took Mr. McCallion to the floor as Kruszewski arrived outside of the cell.

21. Kruszewski thereafter entered the cell and gained control of Mr. McCallion's legs.

22. Mr. McCallion told the Corrections Officers, "I'm done," and he was thereafter locked in his cell without further incident other than Mr. McCallion knocking the handcuff key out of a corrections officer's hand when the corrections officers was attempting to remove the handcuffs through the cell door.

23. Other than knocking the key out of the corrections officer's hand, at no time did Mr.

McCallion struggle or act aggressively or defiantly toward the corrections officers.

24. After the incident, corrections officers contacted the "medical" department to look at what Defendant Ames described in his incident report as a "bump" on Mr. McCallion's head.

25. Erie County Prison nurse Jennifer Wojtecki visited Mr. McCallion's cell that same day to evaluate what she described as a "goose egg" on Mr. McCallion's head.

26. Nurse Wojtecki observed "localized swelling . . . to the left side of inmate's forehead." Nurse Wojtecki instructed that Mr. McCallion be "monitored" and wrote an order for "ice and Motrin."

27. In reality, Mr. McCallion needed much greater treatment than the "ice and Motrin" that had been ordered by Nurse Wojtecki, as he had suffered a traumatic brain injury as a result of Defendant Ames smashing Mr. McCallion's head against the wall.

28. On or about May 16, 2011, Mr. McCallion reported to Erie County Prison staff that he was suffering headaches.

29. As a result, Mr. McCallion was transported to Millcreek Community Hospital for evaluation.

30. Mr. McCallion remained at Millcreek Community Hospital briefly, and was then transported to UPMC Hamot for further evaluation and treatment.

31. Medical professionals performed a CT scan of Mr. McCallion's head and discovered that he had suffered a traumatic brain injury, namely an eight-millimeter acute left-sided subdural hematoma. In a subdural hematoma, blood gathers between two of the membranes surrounding a person's brain.

32. A subdural hematoma can cause an increase in intracranial pressure, which, in turn, can

compress and damage brain tissue.

33. Acute subdural hematomas such as the one suffered by Mr. McCallion are considered life-threatening medical emergencies and have very high mortality and injury rates.

34. On May 17, 2011, on the advice of Belinda Ann Stillman, D.O., treating psychiatrist at the Erie County Prison, the Honorable Michael E. Dunlavey of the Erie County Court of Common Pleas entered an order authorizing UPMC Hamot to perform the necessary surgery to correct a subdural hematoma that Mr. McCallion had suffered.

35. This order was necessary because, as Judge Dunlavey concluded, Mr. McCallion was "incapable of comprehending the fatal consequences of not consenting to this procedure . . . ."

36. On May 18, 2011, Mr. McCallion developed nausea and began vomiting. As a result, Raymond F. Sekula, M.D. determined that it was necessary to perform a surgical procedure on Mr. McCallion including a left-sided decompressive hemicraniectomy, evacuation of the acute subdural hematoma, expansile duraplasty, and operative microscope.

37. Dr. Sekula found that the hematoma had "obviously expanded" since the CT scan was taken just two days earlier.

38. He further found that the source of the bleeding was an injury to an artery, and he cauterized the artery to re-seal it.

39. In the days that followed, healthcare professionals at UPMC Hamot observed that Mr. McCallion was developing an epidural hematoma, which is a pooling of blood between the outermost membrane covering the brain and the skull.

40. An epidural hematoma is a potentially life-threatening condition.

41. On May 23, 2011, Dr. Sekula again operated on Mr. McCallion, this time to evacuate the epidural hematoma. Dr. Sekula found that the hematoma had formed due to bleeding from multiple points on Mr. McCallion's temporal muscle.

42. Mr. McCallion thereafter was discharged from the hospital on May 25, 2011.

43. In the weeks following Mr. McCallion's discharge from the hospital, he began to develop difficulty speaking. Mr. McCallion also suffered seizures resulting from the head trauma he suffered.

44. On July 1, 2011, Mr. McCallion was admitted again to UPMC Hamot, where Adnan S. Mahmood, D.O., found that Mr. McCallion had developed aphasia.

45. Aphasia is an impairment of language ability and is a common neurological symptom of head trauma.

46. In Mr. McCallion's case, he was only able to say one word--"do"--at the time of his admission, which he continued to repeat over and over again.

47. Mr. McCallion was prescribed the anti-seizure medications Vimpat, Keppra, and Zonegran, which largely restored his ability to speak over the next three days, though Mr. McCallion did continue to suffer some difficulty speaking.

48. Mr. McCallion continues to suffer from neurological difficulties to this date, including seizures and visual defects.

49. Mr. McCallion was paroled by order of the Erie County Court of Common Pleas on or about September 1, 2011, and has remained homeless since that time.

## **COUNT I - EXCESSIVE FORCE**

50. The foregoing averments of this Complaint are incorporated herein by reference.

51. As set forth above, Defendant Ames maliciously and sadistically slammed Mr. McCallion's head into the wall and floor for the purpose of causing Mr. McCallion harm and not in a good faith effort to maintain or restore discipline.

52. Defendant Ames intentionally injured Mr. McCallion without just cause or reason and with excessive cruelty.

53. As a result of Defendant Ames' intentional harm to Mr. McCallion, Mr. McCallion suffered severe injuries including a life-threatening traumatic brain injury and developed both acute and chronic neurological symptoms.

54. Mr. McCallion is a small man and was handcuffed at the time Defendant Ames injured Mr. McCallion.

55. It was not necessary for Defendant Ames to slam Mr. McCallion's head into the wall or floor in order to retain control of Mr. McCallion, to address to the safety of staff or inmates, or to otherwise perform any legitimate penological function.

56. Defendant Ames' actions violated the Eighth Amendment rights of Mr. McCallion to be free from the application of excessive force.

57. Defendants Ames acted maliciously and wantonly with reckless and callous disregard in violating the civil rights of Plaintiff McCallion.

WHEREFORE, Plaintiff Jerome McCallion respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Ames including attorneys' fees, costs, interest, and

such other relief as this Honorable Court deems just.

## COUNT II - BATTERY

58.     The foregoing averments of this Complaint are incorporated herein by reference.

59.     As set forth above, Defendant Ames contacted Mr. McCallion and caused Mr. McCallion's head to make contact with the wall and floor.

60.     Defendant Ames' actions caused Mr. McCallion serious and long-lasting harm, including a traumatic brain injury and both acute and chronic neurological defects.

61.     Defendant Ames' actions were intentional, and Defendant Ames intended for Mr. McCallion's head to make contact with the wall and floor.

WHEREFORE, Plaintiff Jerome McCallion respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Ames including attorneys' fees, costs, interest, and such other relief as this Honorable Court deems just.

**JURY TRIAL DEMANDED**

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph M. Kanfer
PA Bar No. 306558
jmk@miznerfirm.com

201 German Street
Erie, Pennsylvania 16507
814.454.3889

*Attorneys for the Plaintiff*